**SEALED**

CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

DEC - 9 2014

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK



# UNITED STATES DISTRICT COURT

### for the
Western District of Virginia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Residence of Billy Ray KEEN<br>1438 Elk Garden Road, Lebanon, Virginia 24266 | )<br>)<br>)<br>)<br>)<br>)     Case No. 1:14 mj 254 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment "A"

located in the _____ Western _____ District of _____ Virginia _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| Title 21, USC, Section 846 | Conspiracy to Possess with the Intent to Distribute Methamphetamine. |

The application is based on these facts:

See Attachment "C"

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

WC Dunn SA ATF
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 12/9/14

*Judge's signature*

City and state: Abingdon, VA

Pamela Meade Sargent USMJ
*Printed name and title*

# ATTACHMENT A

## DESCRIPTION OF PLACES TO BE SEARCHED

**THE PREMISIES:**

A red brick dwelling with white shutters, paved driveway with attached two bay garage on right side of residence. Residence has concrete patio to the rear of the residence with two outbuildings located at the rear of the residence on the same tract of land.

A metal garage/shop red in color with a red metal roof located approximately one hundred yards at the rear of the property on the same tract of land, with a gravel driveway leading to the garage from Creekside Drive.

**VEHICLES/CURTILAGE:**

Any and all vehicles and/or trailers located on the property. Any and all outbuildings located on the property.

**LOCATION OF THE PREMISIES:**

Residence is located at 1438 Elk Garden Road, Lebanon, Virginia.



# ATTACHMENT B

## List of items to be searched for and seized at premise

1. Narcotics, marijuana and other illegal controlled substances.

2. Paraphernalia for packaging, cutting, weighing and distributing illegal drugs, including but not limited to, scales, baggies, and cutting agents.

3. United States currency in excess of $1,000.00.

4. Books, records, receipts, notes, ledgers, letters, and other papers relating to the transportation, ordering, purchase and distribution of controlled substances.

5. Address and telephone books and papers reflecting names, address and telephone numbers.

6. Firearms, firearm magazines, firearm attachments, ammunition, firearm parts and holsters; documentation of the purchase, storage, possession, disposition, dominion and control of firearms, including paperwork and receipts.

7. Books, records, receipts, bank statements, and records, money drafts, letters of credit, money order and cashiers checks, the obtaining, secreting, transfer, and concealment of assets in the obtaining, secreting, transfer, concealment and expenditure of money.

8. Electronic equipment, such as mobile telephones, computers, currency counting machines, electronic media storage devices, surveillance camera storage devices, and any information stored in memory or contained in any related hardware and software.

9. Photographs, in particular, photographs of individuals with firearms and/or controlled substances, and other documents identifying associates and conspirators.

10. Indicia of occupancy, residence, and ownership of the premise, including but not limited to, utility and telephone bills, canceled envelopes, and keys.

11. Any locked or closed container(s) believed to contain any of the above listed evidence.

# Attachment C

1. Your affiant, William C. Duke, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), Washington Field Division, Bristol Post of Duty, having been duly sworn, deposes and states as follows:

## INTRODUCTION

2. I am an investigative law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 United States Code, and am empowered by law to conduct investigations and to make arrests for the offenses enumerated in Section 2516 of Title 18 United States Code.

3. I have been employed as a Special Agent with the ATF since February 2005. I am currently assigned to the Bristol Virginia Field Office. Prior to becoming an ATF Special Agent, I was a Police Officer and Detective with the Chesterfield County Virginia Police Department for five and one half (5 ½) years. During my tenure in law enforcement, I have attended numerous schools and training hosted by ATF, HIDTA, State and local law enforcement, and the Department of Justice, dealing in various techniques of investigating firearms, narcotics and criminal activity. I have taken part in numerous federal, state, and local investigations concerning violations of firearm and narcotic laws.

4. Through instruction and participation in investigations, your affiant has become familiar with the manner and methods by which narcotics traffickers conduct their illegal business and the language and terms that are used to disguise conversations about their narcotics activities. From experience and training, your affiant has learned, among other things, that in conversations narcotics traffickers believe susceptible to interception, they virtually never expressly refer to methamphetamine or other illegal drugs by name; instead to conceal the true nature of their illegal activities and to thwart detection by law enforcement, they refer to the drugs and drug quantities using seemingly innocent terms. Further, based upon your affiant's knowledge, training, experience and participation in firearm and narcotic trafficking investigations, your affiant knows that: Individuals who deal in illegal controlled substances maintain books, records, receipts, notes, ledgers, bank records, money orders, electronic files/data, computers and papers relating to the importation, manufacture, transportation, ordering, sale and distribution of illegal controlled substances. These books, records, receipts, notes, ledgers, bank records, money orders, electronic files, computers, etc., are maintained in locations to which the dealers in illegal controlled substances have ready access, such as within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities, such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

5. Individuals who deal in illegal controlled substances routinely conceal large quantities of currency, financial instruments, precious metals, jewelry, and other items of value, typically proceeds of illegal controlled substance transactions. Indeed, when drug traffickers amass large proceeds from the sale of drugs, they often attempt to legitimize or "launder" these profits. To accomplish this, drug traffickers may utilize domestic and

foreign banks and/or financial institutions and their attendant services, such as securities, cashier's checks, money drafts, letters of credit and safe deposit boxes. All of these items are generally found within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities, such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

6.      It is common for individuals who deal in the sale of illegal controlled substances, to secrete contraband related to the trafficking activity, such as scales, razors, packaging materials, cutting agents, cooking utensils, microwave ovens, hair dryers, blenders, pots, dishes and other containers for preparing methamphetamine and other controlled substances for distribution, within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities, such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

7.      Individuals who deal in the sale and distribution of controlled substances commonly maintain telephone numbers and address books or papers which reflect names, addresses and/or telephone numbers for their associates. These individuals often utilize cellular telephones, and other means of electronic communication to maintain contact with their associates in their illegal businesses. These electronic devices, telephone records, bills and paper are often found within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities, such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

8.      Individuals who deal in illegal controlled substances often take photographs of themselves, their associates, their property and illegal contraband. These photographs are usually maintained within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities, such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

9.      Persons who traffic in controlled substances maintain documents, letters and records relating to their illegal activities for long periods of time. This documentary evidence is usually secreted within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities, such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

10.     Individuals involved in narcotics trafficking often own, possess and/or use firearms as a means of facilitating their illegal drug activities. Said firearms are used to protect and secure a drug traffickers property and narcotics from law enforcement and from theft by other criminals. Drug traffickers also possess firearms as a means of enforcing drug transactions, i.e., as a means of ensuring payment for the drugs they are selling. Such weapons are most often secreted within their residences and the surrounding curtilage;

their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities; such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas. Persons who possess or collect firearms also keep other firearm related equipment, to include ammunition, ammunition magazines, holsters, bullet proof vests, pistol grips, pistol boxes, cleaning kits and paperwork relating to the acquisition and disposition of firearms.

11. Individuals who are members of active drug organizations stay in regular contact with one another. This contact does not terminate once an individual is incarcerated. Incarcerated members of drug organizations routinely send letters to and receive letters from other members of the organization in which they discuss ongoing criminal activities and request various forms of assistance, from financial help to help in engaging in witness intimidation or elimination. In addition, incarcerated members often keep photographs of themselves and other members of their organization in order to obtain respect from other inmates.

12. The information contained in this affidavit is based on my personal observations, observations of other law enforcement officers, observations of Confidential Informants (CI's) and Cooperating Sources (CS) as related to me, my review of official police and government reports, and consultation with other agents/officer involved in the investigation and is provided for the limited purpose of establishing probable cause. The information is not a complete statement of all the facts related to this case.

13. This affidavit is submitted in support of a request that a search warrant(s) be issued for 1438 Elk Garden Rd, Lebanon, VA for violations of Title 21, United States Code, Section 846, Conspiracy to distribute methamphetamine.

14. Beginning in September 2012 law enforcement in Southwest Virginia began to obtain information regarding the manufacturing and distribution of quantities of crystal methamphetamine in the communities of Abingdon located in Washington County, Virginia and Lebanon in Russell County, Virginia. Through arrests, search warrants, interviews, and the cultivation of confidential informants, law enforcement was able to identify a network of individuals involved in the possession and distribution of crystal methamphetamine, firearms trafficking and violent crime in Southwest Virginia, Arizona and California.

15. From September 2012 until the present, federal, state, and local law enforcement have conducted interviews, executed search warrants, conducted surveillance, analyzed phone records and conducted controlled purchases of methamphetamine and firearms from members of the conspiracy. In April 2014 approximately 30 defendants were arrested relating to this investigation. From the arrest, search warrants and interviews associated with this event physical evidence and testimony was gained that show the ongoing and furtherance of a large scale conspiracy to distribute methamphetamines, use of firearms in furtherance of narcotics trafficking and laundering of the proceeds of narcotics trafficking.

16. This investigation has identified several drug trafficking organizations (DTO) operating in SWVA. Though the DTO operate independently members of the DTO associate and do business with one another. The two DTO are identified as the KEEN DTO and the WARREN DTO. The DTO are supplied by Mexican sources in CA and AZ.

17. Members of the KEEN and WARREN drug trafficking organizations (DTO) with sources of supply in CA and AZ during the course of the conspiracy moved pounds of methamphetamine from CA and AZ to the Western District of Virginia. This was done at times in person with hand to hand transactions and the methamphetamine being hidden inside of cattle trucks then hauled back to Virginia. Other times orders were made by phone, a portion of money transferred from the Western District of Virginia to CA or AZ. Once confirmation that the money was received the methamphetamine was shipped via common carrier (UPS or Fed Ex). Members of the DTO in Virginia would often use nominees or co-conspirators to receive the packages at the direction of KEEN or WARREN. Once confirmed that the package of meth was received the remaining funds were transferred to the sources in CA or AZ. From this point the meth was distributed for consumption by members of the DTO using hand to hand transactions or drops. Members of both organizations have distributed firearms or carried firearms during the course of distributing methamphetamine.

## STATEMENT OF PROBABLE CAUSE

18. On September 24, 2012, Billy Ray KEEN was arrested in Memphis, TN in possession of approximately 1½ pounds of methamphetamine. KEEN was operating a rental vehicle and was traveling eastbound en route to his residence in Lebanon, VA. KEEN was in possession of a cellular telephone which utilized telephone number (276) 210-3057.

19. Pursuant to KEEN's arrest, search warrants were obtained and executed by the Russell County Sheriff's Office on KEEN's property on Creekside Drive and his sister Cheryl Owens residence on Elk Garden, Rd in Lebanon, VA. The search warrants for KEEN's property and consent to search for a safe deposit box yielded approximately $28,717.00. No controlled substance was found, Charlotte Keen, wife of Billy Ray KEEN, was present at the time of the consent search.

20. According to the records of Verizon Wireless, telephone number (276) 210-3057 was subscribed to by Charlotte Keen at P.O. Box 1662, Lebanon, VA. As a result of this investigation, your affiant believes that this phone number was utilized by Billy Ray KEEN from at least September, 2012 until present.

21. On February 15, 2013, CS-1 was interviewed in Abingdon, VA. CS-1 stated that Billy KEEN was involved in insurance fraud, stolen property and the transportation and the sale of drugs. CS-1 stated that KEEN concealed methamphetamine in the fuel tanks of trucks. CS-1 stated that a few weeks ago he was aware of thirteen ounces of methamphetamine that were hidden by KEEN.

22. CS-1 stated that KEEN also utilized FedEx/UPS or common carrier to receive

methamphetamine in his wife's name.

23.     On February 18, 2013, CS-1 was interviewed in Abingdon, VA. CS-1 stated Billy KEEN was paying $900.00 per ounce of methamphetamine "out west" and selling it for $3,200.00 in Virginia.

24.     In March 2013, an investigation was initiated into the Raymond MEJIAS Drug Trafficking Organization operating in and around Barstow/Boron, CA. During the course of the investigation, several telephone calls were monitored, by law enforcement, between MEJIAS (subsequently identified as Antonio HERNANDEZ-MOHEDANO) and a subject known only as "Hill Bill" with telephone numbers (276) 210-3057 and (276) 207-3398.

25.     As a result of this investigation, your affiant knows that the user of these telephone numbers was Billy Ray KEEN.

26.     On March 27, 2013, a telephone call was monitored between Antonio HERNANDEZ-MOHEDANO and Billy Ray KEEN on telephone number (276) 210-3057. KEEN asked HERNANDEZ-MOHEDANO for his address so that KEEN could send the money he owed. HERNANDEZ-MOHEDANO told KEEN that "the guy" only paid 37 and KEEN still owed 21.

27.     KEEN told HERNANDEZ-MOHEDANO that it would be a while before he "went over", as he had a court date coming up in Tennessee and owed $15,000.00 for his attorney and his sister's attorney. KEEN told HERNANDEZ-MOHEDANO that he would get that to him by next week.

28.     Based on my training and experience, and my knowledge of this investigation, I believe that Antonio HERNANDEZ-MOHEDANO and Billy Ray KEEN discussed that KEEN owed $2,100.00 to HERNANDEZ-MOHEDANO for an amount of methamphetamine that originally cost $4,800.00. I believe that KEEN had one of his truck drivers pick up the methamphetamine and give $3,700.00 to HERNANDEZ-MOHEDANO in exchange for the methamphetamine.

29.     I believe that KEEN told HERNANDEZ-MOHEDANO that he would not be making a trip to California for additional methamphetamine in the near future because he had to pay for an attorney for himself and for his sister to represent them in a criminal case in Tennessee. I know that Billy Ray KEEN and his sister Cheryl Owens were arrested outside of Memphis, TN in possession of approximately 1½ pounds of methamphetamine in September, 2012.

30.     On March 27, 2013, a controlled purchase of methamphetamine, was made by DEA and task force officers, from Antonio HERNANDEZ-MOHEDANO at 40666 U.S. Highway 395, Boron, CA. This address was utilized as a truck wash business named Reyes Wheel Polishing. The CS purchased ½ pound of methamphetamine from HERNANDEZ-MOHEDANO for $6,000.00.

31. On April 16, 2013, a telephone call was monitored between Antonio HERNANDEZ-MOHEDANO and Billy Ray KEEN utilizing telephone number (276) 207-3398. KEEN identified himself as "Hill Bill" and told HERNANDEZ-MOHEDANO that he had a new phone.

32. KEEN asked HERNANDEZ-MOHEDANO if he would send four (4) "wheels" via Fed Ex and allow KEEN to pay for them next week. KEEN told HERNANDEZ-MOHEDANO that KEEN's truck had broken down. KEEN told HERNANDEZ-MOHEDANO that if he was able to do this, maybe they could start doing this every month or every week or two.

33. On April 17, 2013, a telephone call was monitored between Antonio HERNANDEZ-MOHEDANO and Billy Ray KEEN. HERNANDEZ-MOHEDANO told KEEN that his buddy was going to send him some "wheels" on Friday. HERNANDEZ-MOHEDANO asked KEEN if he got them on Friday, could they be sent to KEEN on Monday, to which KEEN agreed. KEEN told HERNANDEZ-MOHEDANO that he would text his address to HERNANDEZ-MOHEDANO for shipment of the methamphetamine.

34. HERNANDEZ-MOHEDANO received the following text message from KEEN: "*Mike Matney, 1438 Elk Garden Road, Lebanon, VA, 24266.*"

35. Based on my training and experience, and my knowledge of this investigation, I believe that Antonio HERNANDEZ-MOHEDANO agreed to send four ounces of methamphetamine ("wheels") to Billy Ray KEEN via Fed Ex. I know that KEEN and his associates in the distribution of methamphetamine use the term "wheel" to represent one ounce of methamphetamine.

36. I believe that KEEN provided the address of 1438 Elk Garden Rd., Lebanon, VA for HERNANDEZ-MOHEDANO to send the methamphetamine. I know that at the time of this message 1438 Elk Garden Rd., Lebanon, VA was the home address of Billy Ray KEEN.

37. On May 12, 2013, a telephone call was monitored between Antonio HERNANDEZ-MOHEDANO and Billy Ray KEEN utilizing telephone number (276) 207-3398. KEEN asked HERNANDEZ-MOHEDANO if he could send KEEN four (4) or five (5) "wheels." KEEN told HERNANDEZ-MOHEDANO that he (KEEN) could use four (4) or five (5) "wheels" every week if HERNANDEZ-MOHEDANO had access to that much. HERNANDEZ-MOHEDANO responded that he could not do that every week but probably every two (2) weeks. KEEN told HERNANDEZ-MOHEDANO that he would call him back from the other telephone.

38. HERNANDEZ-MOHEDANO received another telephone call from KEEN utilizing telephone number (276) 210-3057. KEEN told HERNANDEZ-MOHEDANO to call this number when he wanted to get in touch with KEEN. KEEN told HERNANDEZ-MOHEDANO that KEEN would utilize the other telephone to call HERNANDEZ-

MOHEDANO. HERNANDEZ-MOHEDANO agreed to send the "wheels" to KEEN on Wednesday or Thursday of that week via Fed Ex.

39. Based on my training and experience, and my knowledge of this investigation, I believe that Antonio HERNANDEZ-MOHEDANO agreed to send four (4) or five (5) ounces of methamphetamine ("wheels") to Billy Ray KEEN. I believe that KEEN told HERNANDEZ-MOHEDANO that KEEN could sell that amount every week if HERNANDEZ-MOHEDANO could supply it. I believe that HERNANDEZ-MOHEDANO told KEEN that four (4) or five (5) ounces of methamphetamine per week was too much, but that HERNANDEZ-MOHEDANO could supply that amount to KEEN every two (2) weeks.

40. I believe that KEEN utilized telephone number (276) 207-3398 to call HERNANDEZ-MOHEDANO, then utilized telephone number (276) 210-3057 to call him a second time. I believe that KEEN told HERNANDEZ-MOHEDANO to contact him on the second number, and KEEN would contact HERNANDEZ-MOHEDANO from the first number. I know that it is common for those involved in drug trafficking activities to have multiple cellular telephones and change telephone numbers frequently to avoid detection by law enforcement. I believe that KEEN attempted to thwart law enforcement detection by utilizing at least two (2) separate cellular telephones in his communications with HERNANDEZ-MOHEDANO.

41. On May 15, 2013, a search warrant was executed at 40666 U.S. Highway 395, Boron, CA (Reyes Wheel Polishing). Seized pursuant to the search warrant were approximately five (5) pounds of methamphetamine, scales with methamphetamine residue and three (3) containers designed to conceal narcotics, $70,474 in US Currency and a 2007 Nissan Titan (Asset IDs: 13-DEA-582614 and 13-DEA-582616). Antonio HERNANDEZ-MOHEDANO, along with five (5) other Hispanic males, was arrested for possession with the intent to distribute methamphetamine.

42. On July 9, 2013, a CS-2 was interviewed in the Western District of VA. CS-2 stated that even after Billy Ray KEEN's arrest in September 2012, KEEN continued to supply methamphetamine to the area of Southwest Virginia. CS-2 stated that he/she was aware of several of KEEN's current methamphetamine customers.

43. CS-2 stated that KEEN's current cellular telephone number was (276) 210-3057. CS-2 stated that he/she had personal knowledge that KEEN utilized the text messaging service on his cellular telephone to arrange drug transactions. CS-2 stated that KEEN and his drug customers utilized the word "wheel(s)" when referring to ounces of methamphetamine.

44. On July 11, 2013, CS-2 met with KEEN and told KEEN that CS-2 was interested in purchasing methamphetamine for resale. KEEN told CS-2 that KEEN was in a position to assist CS-2.

45. On July 14, 2013, CS-2 spoke with KEEN who called from 276-210-3057. KEEN told

CS-2 that KEEN would sell one ounce of crystal methamphetamine ("wheel") to CS-2 for $2,200.00.

46. Between July 14 and July 16, 2013, CS-2 and KEEN (utilizing 276-210-3057) exchanged the following text messages:

CS-2 to KEEN, "*I will be at my shop by 3. U comin up just need that one wheel. I will show u the other I had to get on your truck it will be out tomorrow.*"

CS-2 to KEEN, "*Hey u got me on wheel*"

KEEN to CS-2, "*Yes*"

CS-2 to KEEN, "*Good deal what time*"

KEEN to CS-2, "*Tomorrow anytime*"

47. Based on my training and experience, and my knowledge of this organization, I believe that Billy Ray KEEN utilized the text messaging service on his cellular telephone to confirm a transaction with CS-2 involving the sale of one (1) ounce of methamphetamine.

48. Throughout the course of this investigation, text messages were received via search warrant on telephone number (276) 210-3057, which was utilized by Billy Ray KEEN. Excerpts from the data collected have been incorporated within this affidavit under the headings of the co-conspirators with whom KEEN communicated.

49. On August 1, 2013, CS-2 was utilized to make a controlled purchase of four (4) firearms from William J. KEEN (BJ) and his father, Billy Ray KEEN, in Tazewell County, VA. CS-2 tells the KEENS that he and the bikers he is taking the guns to are convicted felons. During a recorded conversation with CS-2, KEEN stated that his methamphetamine source of supply had been "cut off" by the Mexicans due to a missing package of methamphetamine. KEEN told CS-2 that his source of supply was supposed to receive the methamphetamine via UPS or similar shipping methods, and the last package had not arrived.

50. On August 5, 2013, CS-1 was interviewed in Abingdon, VA. CS-1 stated that Bill KEEN ran a methamphetamine distribution organization in SW VA. CS-1 stated that KEEN had people that drove trucks for him from the area of Four Corners (Barstow), CA to VA transporting methamphetamine. CS-1 stated that the methamphetamine was also delivered to KEEN via Fed Ex. Based on my training and experience, and my knowledge of this organization it is believed that the source KEEN is referencing in this statement was WARREN.

51. CS-1 stated that they drove a truck coast to coast for KEEN for over a year, from the summer of 2011 until October, 2012 and that they dealt with KEEN until February, 2013 when they were arrested. CS-1 stated that KEEN directed them to pick up

methamphetamine in California, and upon their return would receive meth from KEEN. CS-1 stated KEEN paid $8,000.00 to $10,000.00 per pound out west and sold it in Virginia for approximately $50,000.00. CS stated that KEEN "cut" the methamphetamine with MSM.

52.    CS-1 stated that all of the methamphetamine obtained by KEEN came from the Mexican Cartel. CS-1 stated that KEEN purchased one (1) to 1 ½ pounds of methamphetamine at a time, approximately once a month. CS-1 stated that KEEN paid for the methamphetamine using a Wal-Mart MoneyGram.

53.    CS-1 stated that Michael WARREN, "Opie" GIBSON, Shannon (PEACE) and others worked as drivers for KEEN. CS-1 stated that WARREN, GIBSON and PEACE were also involved in the methamphetamine business with KEEN.

54.    On August 8, 2013 GRAVES texts WARREN UPS Tracking number U5602409720, WARREN forwards this number to KEEN. UPS records show this package was shipped from Phoenix, AZ on August 8, 2013 and delivered to CREEKSIDE TRUCKING, 1438 Elk Garden Rd, Lebanon, VA on August 9, 2013.

55.    On August 9, 2013, as directed by law enforcement, CS-2 met with KEEN regarding the purchase of methamphetamine and recorded the conversation. KEEN and CS-2 discussed taking a trip to California to purchase 1½ pounds of methamphetamine. KEEN told CS-2 that KEEN currently paid $1,500.00 per ounce of methamphetamine, and charged CS-2 $2,200.00 per ounce so as to make $700.00. KEEN told CS-2 that if they made the trip and bought in bulk, they could pay as little as $1,300.00 per ounce of methamphetamine. KEEN told CS-2 that KEEN usually received a shipment of methamphetamine every month. KEEN spoke with CS-2 about paying Bill HONAKER with two (2) ounces of methamphetamine to repair his truck.

56.    On August 9, 2013, CS- 2 was utilized to make a controlled purchase of one (1) ounce of methamphetamine from Billy Ray KEEN in Tazewell County, VA. During the transaction, CS-2 observed what he believed to be an additional two (2) ounces of methamphetamine in the center console of KEEN's vehicle.

57.    Surveillance during this operation observed a UPS shipment being made to KEEN's residence just prior to KEEN contacting CS-2 about purchasing methamphetamine.

58.    UPS records show that UPS Tracking number U5602409720 was shipped from Phoenix, AZ on August 8, 2013 and delivered to Creekside Trucking, 1438 Elk Garden Rd, Lebanon, VA on August 9, 2013.

59.    On August 12, 2013, Billy Ray KEEN and Michael Allen WARREN exchanged the following text messages:

WARREN to KEEN, "*0 boy you no i cant belive that you would try to go and try to do something with out me noing you no you charge me 2000 and i let you for 1000 and not make*"

KEEN to WARREN, "*n i dont know what wrong u told me yourself u would give me his name and number so what is wrong i have told thanks a thousand times and i still mean it*" "*n ng wrong when u called me in ca i told u where to go to find markus I hav never been two face with u*"

60.    Based on my training and experience, and my knowledge of this investigation, I believe that Michael WARREN who was a methamphetamine source of supply (SOS) to Billy Ray KEEN introduced KEEN to his SOS (Larry Ray GRAVES in Phoenix, AZ). I believe that KEEN obtained a direct contact number for GRAVES and attempted to cut WARREN out of the middle. I believe that KEEN told WARREN that it was no different than when KEEN introduced WARREN to "Markus" in California. I believe that when referring to "Markus", KEEN was referring to Antonio HERNANDEZ-MOHEDANO.

61.    On August 14, 2013, CS-1 was interviewed in Bristol, VA. CS-1 stated that he used to drive a truck for Billy KEEN. CS-1 stated that when in the area of Barstow, CA, he received direction from KEEN to pick up methamphetamine from a Mexican at a truck stop. KEEN sent CS-1 money via MoneyGram and told CS-1 to call once he arrived at the truck stop. CS-1 called KEEN as directed. KEEN told CS-1 to go inside and ask for "Pison." CS-1 did as directed and purchased 1/4 ounce of meth for $300.

62.    CS-1 stated that he had purchased five (5) ounces of methamphetamine from KEEN on two separate occasions, and four (4) ounces on one occasion. CS-1 stated that he had purchased grams and "8 balls" (1/8 ounce) of methamphetamine from KEEN on numerous occasions. CS-1 stated that in the summer of 2012, he observed KEEN in possession of one (1) pound of methamphetamine and ½ pound of methamphetamine on separate occasions. CS-1 stated that this occurred in Lebanon, VA. CS-1 stated that KEEN always carried a pistol on his person. CS-1 stated that on one occasion, KEEN laid a semiautomatic handgun beside him while he sold two (2) "8 balls" of methamphetamine to CS-1.

63.    On August 19, 2013, CS-2 was utilized to make a controlled purchase of one (1) ounce of methamphetamine from Billy Ray KEEN at his residence located at 1438 Elk Garden Rd., Lebanon, VA. On August 24, 2013 GRAVES exchanged the following text messages with KEEN:

GRAVES to KEEN,
"*That's good i don't want anyone knowing nothing this is between you, me the mexicans i work for no-one else should know are we clear on that*"

"*Ok i'm gonna go pick it up now once i leave with it from their place it's ours and it will have to be paid for just so you know*"

*"I have a pickup scheduled for 6 o'clock this afternoon. for monday delivery, i m on top of it i take this shit very serious u don t have to worry about anything if there is a problem that ever comes up i guarantee you that it wont be something that i did wrong it will be either ups or you i dont make mistakes when it comes to doing this i like my freedom to much to fuck up"*

64. On August 24, 2013, KEEN texts GRAVES Green Dot reload PIN numbers 876 231 6125 3801 and 567 007 9755 3212 and on August 26, 2013, PIN number 611 275 3262 7426. The reloads were for $1,000 each and were obtained at a Wal-Mart in Hope, AR on August 24, 2013. The first two were loaded onto a card in the name of David BOGGS and the third onto GRAVES personal Green Dot card.

65. On August 26, 2013, GRAVES texts KEEN " *It's the same tracking number I gave you the other day.....*" KEEN then responds *"U never gave to me U just showed me a picture…"* UPS records do not show any shipments August 22 – 26, 2013.

66. On August 28, 2013 GRAVES and KEEN exchanged the following text messages:

*" well it s not good news this morning they are telling me that it has been forwarded to a government agency for further investigation so when they said that i just hung up this makes 1 lb of green and 41 ozs of this that has been got this year from me bill i won t leave you hanging on this however the only way that i can afford to fix this is to discount the next 6 letters i will sell to you at my price until the 3000 00 is made up to you i pay 2500 00 for the size that i sent you i can get it to you for that price the next 6 times and that will make up what u lost that s the best i can do"*

*·and i ve got another question for you my friend with whom i work for ran your name through ncic data base and it seems that you ve been in trouble in shelby county tn why haven t you said anything to me about that myself i could care less about long as you are doing the right thing in order to get it taken care of but my guy on the other hands is kinda freaked out by the whole deal i m gonna call you this afternoon and when i do if you don t mind justexplain to me what happened and i will relay it to him i can get it out today but your gonna have to send me the money and trust me to get it done this has happened 3 times now with mike and i and i ve held my end up allthe times so it s too you on what you as to want to do and also i will change carriers if that's what u want just let me know who you want to use"*

67. On August 28, 2013, GRAVES texts KEEN UPS Tracking number U5603606809. UPS records show this package was shipped from Phoenix AZ on August 28, 2013 and delivered to Jeff Wood, 1621 Clifton Farm Rd, Honaker, VA on August 29, 2013. On August 23, 2013, Jeff WOODS (STEVENS) texted this address to KEEN who the forwarded the address to GRAVES on August 24, 2013.

68. On August 28, 2013, KEEN texts GRAVES Green Dot reload PIN numbers 288 838 5677 6820 ($500); 379 310 9023 6634 ($1,000) and 147 156 8967 7091 ($1,000) which

were all loaded on to GRAVES' personal Green Dot card.

69.    Based on my training and experience, and my knowledge of this investigation, I believe that Billy Ray KEEN utilized the text messaging to communicate with Larry GRAVES about the purchase of methamphetamine, shipment of methamphetamine and related payments.

70.    On August 28, 2013, CS-1 was interviewed in Castlewood, VA. CS-1 stated that between June 2012 and February, 2013 they received an "8 ball" of methamphetamine every other day from Billy KEEN. CS-1 stated that there were times he purchased grams and times he purchased ounces of meth from KEEN. CS-1 stated that approximately once a week he purchased ½ ounce or one (1) ounce of methamphetamine from KEEN for resale. This totals to approximately 1500 grams of methamphetamine from KEEN.

71.    CS-1 stated that the time he observed KEEN with one (1) pound of methamphetamine, KEEN was armed with a silver revolver. CS-1 stated that this occurred at KEEN's red barn/shop located on Creekside Dr. in Lebanon, VA.

72.    On August 30, 2013, CS-2 was utilized to make a controlled purchase of one (1) ounce of methamphetamine from Billy Ray KEEN at his "shop", located on Creekside Drive. Prior to the purchase, CS-2 arranged to purchase one (1) "wheel" from KEEN for $2,200.00. KEEN advised CS-2 that he was out of town and would send his sister, "the one who was with me in Memphis" to consummate the transaction. Instead of KEEN's sister, Alicia HARR, the girlfriend of KEEN driver Shannon PEACE, arrived and took the money from CS-2. CS-2 speaks to KEEN via cell phone. HARR counts the money, tells KEEN by phone it is ok and KEEN tells CS-2 where the meth is located. CS-2 collects the meth which was in a container by a gate near the shop, as directed by KEEN.

73.    On September 5, 2013, a controlled purchase of one (1) ounce of methamphetamine was made from Billy Ray KEEN in the parking lot of the Wal-Mart located in Lebanon, VA. Following the purchase, law enforcement surveillance followed KEEN into Wal-Mart and observed him purchase a Green-dot money card.

74.    On September 5, 2013, GRAVES texts KEEN UPS Tracking number U5603606854. KEEN forwards the tracking number to Shannon PEACE and asks PEACE to check on it. On September 5, 2013 KEEN and GRAVES and KEEN and PEACE exchanged the following text messages:

KEEN and GRAVES:*"creekside trucking 1438 elk garden road lebanon va. 24266 71615046919894 88412905800318"*
*"your tracking# u5603606854"*
*"ok thanks"*

PEACE and KEEN: *"2580 mendota rd Mendota va 24270"*
*"hey can u check tracking number again for me"*
*"yes, UPS"*

*"yes"No good yet*
*Let me know*
*OK*
*Can U check it*
*Just did no good*
*Still not showing*
*Still no good*
*He just called can U try again*
*"he just called can u try again"*
*,"yes it is it shows a pickup scan at 309pm, u5603606854,*
*https://m.ups.com/mobile/track?loc=en_us#track"*
*U5603606854*
*U5603606854*
*Yes*
*Is it OK*

KEEN and GRAVES: *"63659090944949"*
*"u need to check the last money park number that you gave me its not working"*
*"83659090944949"*
*"i got it thanx"*

75. UPS records show that UPS Tracking number U5603606854 was shipped from Phoenix, AZ on September 5, 2013 and was delivered to CREEKSIDE TRUCKING, 1438 Elk Garden Rd, Lebanon, VA on September 9, 2013.

76. Green Dot records identify 71615046919894, 88412905800318 and 83659090944949 as Green Dot Money Pak reload PINS for $1,000, $500 and $1,000 respectively. The Money Paks were obtained at the Walmart in Lebanon, VA on September 5, 2013, and loaded on to GRAVES' personal Green Dot card.

77. On September 6, 2013 KEEN and PEACE, KEEN and STEVENS and KEEN and GRAVES exchanged the following text:

KEEN and STEVENS: *"did u get that"*
*"going to get it now on my way"*
*"ok let me know"*
*"its not there I looked at front door too"*
*"ok"*

KEEN and PEACE: *"can u check the number"*

KEEN and STEVENS: *"can u check back in couple hour"*

KEEN and GRAVES: ,*"can u check package hasn't showed"*
*"ok"*

*"fuck!!!!!!! your gonna have to call 800pickups let them know your the receiver give them the tracking # and they will let you know what is up"*

KEEN and STEVENS: *,"its still not there"*

78.  On September 7, 2013 KEEN and STEVENS exchange the following text: *,"still nothing I will check again Monday"*

79.  On September 9, 2013 KEEN and PEACE and KEEN and STEVENS exchange the following text messages:

KEEN and STEVENS: *"still nothing there"*
*"it will be they called this morn for directions"*
*"what time u think"*
*"next hour"*

KEEN and PEACE: *"can u check for me"*
*"ok"*
*"u did send it to new address its not in mailbox"*
*"ok thanks, she said should b there by 6"*

80.  UPS records show that UPS Tracking number U5603606854 was shipped from Phoenix, AZ on September 5, 2013 and was delivered to CREEKSIDE TRUCKING, 1438 Elk Garden Rd, Lebanon, VA on September 9, 2013.

81.  Based on my training and experience, and my knowledge of this investigation, I believe that Billy Ray KEEN utilized the text messaging service to communicate with Jeff Stevens and Shannon Peace about the expected shipment of methamphetamine from Larry GRAVES.

82.  On September 25, 2013, CS-2 was used to make a controlled purchase of one (1) ounce of methamphetamine from Billy Ray KEEN in Claypool Hill, VA. KEEN told the CS that if they purchased six (6) "wheels" (ounces of methamphetamine) at a time, the supplier would discount the purchase price by $400.00 each. KEEN stated that he made $400.00 per ounce sold, and he sold two (2) ounces per week on average, making $800.00 per week selling methamphetamine.

83.  On January 9, 2014, CS-1 met with Bill KEEN at his residence located on Elk Garden Rd. in Lebanon, VA. CS and KEEN discussed the "feds" watching KEEN and possible "snitches." KEEN searched the CS to make sure he wasn't wearing a transmitter for law enforcement.

84.  While CS-1 and KEEN were visiting, Shannon PEACE arrived and obtained what appeared to be one (1) ounce of methamphetamine from KEEN. PEACE gave a ride to CS-1 and offered to let CS-1 smoke some of the methamphetamine. PEACE gave some methamphetamine CS-1, who declined and made a job related excuse.

85.  On January 30, 2014, CS-2 contacted Billy Ray KEEN to arrange a purchase of methamphetamine.  During the following text message conversation, KEEN agreed to sell CS-2 two (2) ounces of methamphetamine ("exhaust pipe") for $4000.00.  The controlled transaction took place on the same date.

### January 30, 2014

CS-2 to KEEN, *"U around town today or on road?"*
KEEN to CS-2, *"Home"*
CS-2-? to KEEN, *"U no were I can buy exhaust pipe at ? I'm puttin in new shop in raven"*
KEEN to CS-2, "*Im at walmart working on truck"*
CS-2 to KEEN, *"I got to run to Bristol how long u be there."*
KEEN to CS-2, *"Taking alternator off im leaving town this evening some time"*
CS-2 to KEEN, *"Hey got 3800 that good for 2 so I'm not broke."*
CS-2 to KEEN, *"I'm leaving here at harley shop in 20 mins"*
KEEN to CS-2, *"Ok"*
CS-2 to KEEN, *"that work or I need other two"*
KEEN to CS-2, *"U ne"*
CS-2 to KEEN, *"I got is just trying. Lol"*
KEEN to CS-2, *"Ok"*

### April 24, 2014

86.  CS-2 meets with KEEN in the WDVA.  The two discuss drug trafficking and their criminal past.  After the meeting the following text  messages are sent between CS-2 and KEEN:
CS-2 to Keen: *whats the dollar on parts*
Keen to CS-2: *2*
CS-2 to KEEN: *a wheel*
KEEN to CS-2: *Yep 2,000*

87.  Based on my training and experience, and my knowledge of this investigation, I believe that Billy Ray KEEN utilized the text messaging service to communicate with CS-2 about the sale of methamphetamine.

88.  August 29, 2014, RCSO Deputy Brandon Yates makes contact with KEEN on an unrelated matter .  KEEN gives the Deputy the number of 276-210-1715 as his current telephone number.

89.  On August 31, 2014 CS-2 states that he received the number of 276-210-1715 as KEEN's new number.

90. According to the records of Verizon Wireless, telephone number (276) 210-1715 was resold to TracFone Wireless and activated on April 28, 2014. TracFone Wireless does not require personal information to purchase and/or activate cellular service, and there is no subscriber information for this number. Telephone toll analysis conducted in September 2014 revealed that KEEN continued to be in contact with STEVENS, GRAVES, WARREN and other members of the conspiracy up through September 05, 2014.

91. On September 11, 2014 SA Brewer received court ordered phone records showing that 276-210-1715 is subscribed to by KEEN since April 29, 2014. Analysis of the records show KEEN in contact with STEVENS, GRAVES, WARREN and other members of the conspiracy up through September 05, 2014.

92. On October 06, 2014 CS-20 brokered a deal to receive an ounce of meth from KEEN for $1500, $750 up front and $750 upon delivery. The CS as directed by KEEN puts $750 on two NetSpend cards and send the numbers of the cards to KEEN. KEEN tells the CS that his source will overnight the meth and they will have it tomorrow. Records obtained from NetSpend Corporation identify 6772253404 and 6090547728 as prepaid card reload PINS for $400 and $350 respectively. Netspend records further show that these funds were loaded on to prepaid card number 5311 0606 4858 0360 i/n/o Larry GRAVES, 6001 W Pinchot Ave, Phoenix, AZ 85033 (Netspend Account # 7006351743).

93. On October 07, 2014 CS-20 stated that he had spoken to KEEN and KEEN told him that the source is "Bicycle" from AZ. The CS stated that he has dealt with "Bicycle" in Phoenix. SA Duke showed the CS a TX DMV photo of GRAVES and the CS identified the picture as "Bicycle." The meth was never shipped and KEEN told the CS that they got screwed again.

94. On October 28, 2014 CS-20 arranges a meeting with KEEN and introduces a UC officer to KEEN as the guy who put the money up for the deal on 10/6/14. KEEN explains that his source never shipped the meth. KEEN tells the UC that he can get meth every week and negotiates a deal to sell the UC for $2000 for the first two ounces and $2200 an ounce after that. KEEN stated that he felt partially responsible for the deal that fell through. KEEN stated that he just returned home from a trip and brought two ounces back with him for his guy in Honaker (Stevens). KEEN stated that he will bring it back himself or ship it. During the deal KEEN provided numbers to CS-20 for "Bicycle" (GRAVES) and "Marcus" (MOHEDANO). Both of these are identified and sources of supply for KEEN.

95. On October 29, 2014 CS-20 and CS-21 were interviewed. CS-20 stated that the first time they can recall getting meth from KEEN was in spring/summer 2011. CS-20 purchased 3 grams of meth from Keen at a truck stop near Des Moines, Iowa. CS-20 paid KEEN $300 for the meth. CS-20 stated that in late summer 2012 CS-20 repaired the air leveler on a trailer for KEEN in the parking lot of the Wal-Mart in Lebanon, VA. KEEN paid CS-20 a gram of meth for the work. The next week KEEN brought a ½ ounce of meth by CS-20's residence on front. CS-20 paid KEEN $200 and told KEEN that he

was not paying him back because KEEN owed him $1500 back wages for when CS-20 was driving for KEEN. After this KEEN continued to supply meth and it was cash and carry a gram at a time for $100. Around this time KEEN got arrested in Shelby County, TN. About a month later October/November 2012 until April 2014 CS-20 and CS-21 would get a gram once or twice a week (approximatley18-20 grams with total from KEEN 35-40 grams). CS-21 stated that from 2011 until Summer 2014 CS-21 and CS-20 would get a gram up to an 8 ball from KEEN 1-2 times per week (at least 150 grams) for $100-120 per gram and $250-300 per 8 ball. CS-21 recalled that in 2012 or 2013 they were at KEEN's house on Elk Garden to purchase a gram of meth and KEEN could not find it; KEEN's wife was at work. KEEN was looking around and picked up a clear Tupperware bowl the size of a ball cap that was full of crystal meth. KEEN sold CS-21 a gram of the meth. CS-21 estimated that there were several ounces of meth in the bowl.

96.   Records supplied by subpoena from American Electric Power show that the electric service at 1438 Elk Garden Rd, Lebanon, VA is active and in the name of Billy Ray KEEN since December 20, 2012.

## TECHNICAL TERMS

97.   Based on my training and experience, I believe the following technical terms are used to convey the following meanings:

   a.   IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

   b.   Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

   c.   Storage medium: A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, floppy disks, flash memory, CD-ROMs, and several other types of magnetic or optical media not listed here.

   d.   Cellular telephone: A cellular telephone (or mobile telephone, cellular device, or wireless telephone) is a handheld wireless device used primarily for voice

communication through radio signals. These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities. These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

e. Digital camera: A digital camera is a device that records still and moving images digitally. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

f. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store any digital data, such as word processing documents, even if the device is not designed to access such files. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

## COMPUTERS, CELLULAR DEVICES, STORAGE MEDIUMS AND FORENSIC ANALYSIS

98. As described above and in Attachment B, this application seeks permission to search and seize records that might be found on the PREMISES, in whatever form they are found. One form in which the records might be found is stored on a computer's hard drive, whether internal or external, cellular device, or other storage media. Some of these electronic records might take the form of files, documents, and other data that is user-generated. Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis.

99.   I submit that if a computer, cellular device, or storage medium is found on the premises, there is probable cause to believe those records will be stored in that computer, cellular devices, or storage medium, for at least the following reasons:

   g.   Based on my knowledge, training, and experience, I know that computer files and other electronic information or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer or cellular device, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

   h.   Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

   i.   Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

   j.   Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

100.  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how computers were used, the purpose of their use, who used them, and when.

101.  Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processor, picture, and movie files), computer storage media can contain other forms of electronic evidence as well:

   k.   Forensic evidence of how computers were used, the purpose of their use, who used them, and when, is, as described further in Attachment B, called for by this warrant. Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been

deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

l. Forensic evidence on a computer, cellular device, or storage medium can also indicate who has used or controlled the computer, cellular device, or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer, cellular device, or storage medium at a relevant time.

m. A person with appropriate familiarity with how a computer or cellular device works can, after examining this forensic evidence in its proper context, draw conclusions about how computers or cellular devices were used, the purpose of their use, who used them, and when.

n. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance with particularity a description of the records to be sought, evidence of this type often is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer or cellular device is evidence may depend on other information stored on the computer or cellular device, and the application of knowledge about how a computer or cellular device behaves. Therefore, contextual information necessary to understand the evidence described in Attachment B also falls within the scope of the warrant.

o. Further, in finding evidence of how a computer or cellular device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, I know from training and experience that it is possible that malicious software can be installed on a computer, often without the computer user's knowledge, that can allow the computer to be used by others, sometimes without the knowledge of the computer owner. Also, the presence or absence of counter-forensic programs (and associated data) that are designed to eliminate data may be relevant to establishing the user's intent. To investigate the crimes described in this warrant, it might be necessary to investigate whether any such malicious software is

present, and, if so, whether the presence of that malicious software might explain the presence of other things found on the storage medium. I mention the possible existence of malicious software as a theoretical possibility, only; I will not know, until a forensic analysis is conducted, whether malicious software is present in this case.

102. Searching storage media for the evidence described in the attachments may require a range of data analysis techniques. It is possible that the storage media located on the premises will contain files and information that are not called for by the warrant. In rare cases, when circumstances permit, it is possible to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence. For example, it is possible, though rare, for a storage medium to be organized in a way where the location of all things called for by the warrant are immediately apparent. In most cases, however, such techniques may not yield the evidence described in the warrant. For example, information regarding user attribution or Internet use is located in various operating system log files that are not easily located or reviewed. As explained above, because the warrant calls for records of how a computer or cellular device has been used, what it has been used for, and who has used it, it is exceedingly likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents. Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this premises for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant. Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack space. This, too, makes it exceedingly likely that in this case it will be necessary to use more thorough techniques.

103. Based upon my knowledge, training and experience, it is known to this agent that records and media contained on cellular devices, computers and storage media, may be printed onto paper or other means of permanent "hard-copy."

104. Based upon my knowledge, training and experience, I know that a thorough search for information stored in storage media often requires agents to seize most or all storage media to be searched later in a controlled environment. This is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. Additionally, to properly examine the storage media in a controlled environment, it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined in the controlled environment. This is true because of the following:

   p. The nature of evidence. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer or cellular device has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable.

q. The volume of evidence. Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical and invasive to attempt this kind of data search on-site.

r. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

s. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

105. In light of these concerns, I hereby request the Court's permission to seize the computer hardware, storage media, and associated peripherals, if any are present, that are believed to contain some or all of the evidence described in the warrant, and to conduct an off-site search of the computer hardware, storage media, and associated peripherals, for the evidence described, if, upon arriving at the scene, the agents executing the search conclude that it would be impractical to search the computer hardware, storage media, and associated peripherals on-site for this evidence.

106. Because, on information and belief, several people share the PREMISES as a residence, it is possible that the PREMISES will contain computers that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If agents conducting the search nonetheless determine that it is possible that the things described in this warrant could be found on any of those computers or storage media, this application seeks permission to search and if necessary to seize those computers or storage media as well. It may be impossible to determine, on scene, which computers or storage media contain the things described in this warrant.


## CONCLUSION

107. Based on your affiant's knowledge, training, experience, and participation in this investigation involving the distribution of methamphetamine your affiant knows that:

- Individuals involved in narcotics trafficking often maintain documents, letters and records relating to their illegal activities for long periods of time. This documentary evidence is usually secreted within their residences and the surrounding outbuildings; their vehicles; the residences of family members, friends and associates; the places in which they conduct their business; or in storage areas. Based on the facts set forth in this affidavit it is believed that probable cause exist that records, fruits, instrumentalities, and evidence of a crime pertaining to the alleged offenses are maintained at the locations owned or occupied by the conspirators detailed in attachment A, which is incorporated and made a part of this Affidavit.

- Your affiant has examined land records and utility records for the location to be searched, and has conducted surveillance of the location to be searched. My examination has determined that the property to is a residence of and in the dominion and control of KEEN.

- As revealed by this investigation, KEEN and other co-conspirators have received cash from illegal drug transactions. Numerous controlled purchases and deliveries of suspected narcotics have taken place at 1438 Elk Garden Road, Lebanon, VA. Your affiant believes that records, documents, fruits and instrumentalities of the charges set fourth of conspiracy to distribute methamphetamine will be located 1438 Elk Garden Road, Lebanon which is owned, occupied, under the dominion or control of KEEN.

- The affiant has examined land records and utility records for the location to be searched, and has conducted surveillance of the location to be searched. My examination has determined that the property is a residence of and in the dominion and control of KEEN.

108. Based upon the facts set forth above, I believe there is probable cause for the issuance of a search warrant for the property of KEEN located at 1438 Elk Garden Road detailed in attachment A, which is incorporated and made a part of this Affidavit.


## REQUEST FOR SEALING

It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time. Based upon my training and experience, I have learned that, online criminals actively search for criminal affidavits and search warrants via the internet, and disseminate them to other online criminals as they deem

appropriate, i.e., post them publicly online through the carding forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

I declare under the penalty of perjury that the foregoing is true and accurate to the best of my knowledge and belief. Executed on _December 9_, 2014.

_____                    _12/9/14_

William C. Duke, Special Agent, (ATF)                    Date

Subscribed and sworn to before me, this the ___8th___ day of ~~December~~ 2014.

_____

US Magistrate Judge
Pamela Meade Sargent